# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Frank E. Priley,                                      Civ. No. 12-1492 (JNE/JJK)

       Plaintiff,

v.

Michael J. Astrue,                          **REPORT AND RECOMMENDATION**
Commissioner of Social
Security,

       Defendant.

Sean M. Quinn, Esq., Falsani, Balmer, Peterson, Quinn & Beyer, counsel for
Plaintiff.

Gregory G. Brooker, Esq., Assistant United States Attorney, counsel for
Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g), Plaintiff Frank E. Priley seeks judicial

review of the final decision of the Commissioner of Social Security ("the

Commissioner"), who denied Plaintiff's application for disability insurance

benefits.  This matter is before this Court on the parties' cross-motions for

summary judgment.  (Doc. Nos. 6, 14.)  The matter has been referred to the

undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and

D. Minn. LR 72.1.

At the time of the hearing before the Commissioner, Plaintiff was disabled as a result of having multiple sclerosis.  The Commissioner ultimately concluded, through the decision of an Administrative Law Judge, that Plaintiff's multiple sclerosis rendered him disabled for the first time in 2007 or 2008.  However, the issue in this appeal from the denial of Plaintiff's application for disability insurance benefits is whether the Commissioner properly concluded that Plaintiff was not disabled prior to the date he was last insured, December 31, 2004.  *See*, *infra*, n.3.  For the reasons stated below, this Court concludes that the Commissioner's decision that Plaintiff was not disabled prior to December 31, 2004, was appropriately supported by the record.  Accordingly, this Court recommends denying Plaintiff's motion and granting Defendant's motion.

## BACKGROUND

### I.    Procedural History

Plaintiff protectively filed an application for disability insurance benefits on October 2, 2008, alleging a disability onset date of June 2, 2004.  (Tr. 106.)[1]  His date last insured was December 31, 2004.[2]  (Tr. 63.)  The application was denied initially and on reconsideration.  (Tr. 63–65.)  Plaintiff timely requested a hearing, which was held before an Administrative Law Judge ("ALJ") on June 14, 2010.

---

[1]    This Court refers to the Administrative Record (Doc. No. 5) by the abbreviation "Tr." throughout this Report and Recommendation.

[2]    A claimant has to establish "the existence of a disability on or before the date that the insurance coverage expires."  *Basinger v. Heckler*, 725 F.2d 1166, 1168 (8th Cir. 1984).

(Tr. 21, 77.)  On January 6, 2011, the ALJ issued an unfavorable decision. (Tr. 18–28.)  Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on May 16, 2012.  (Tr. 1–7.)  In addition to reviewing the record, the Appeals Council reviewed the additional evidence that was presented after the hearing.  (Tr. 1–2, 4–5.)  When the Appeals Council denied review, the ALJ's decision became the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g); *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005); *Browning v. Sullivan*, 958 F.2d 817, 822–23 (8th Cir. 1992).  On June 21, 2012, Plaintiff filed this action seeking judicial review pursuant to 42 U.S.C. § 405(g).  (Doc. No. 1, Compl.)  The parties have filed cross-motions for summary judgment.  D. Minn. LR 7.2.

## II.    Statement of Facts

Plaintiff graduated from high school.  (Tr. 131.)  He owned and operated a liquor store from 1981 through 2000.  (Tr. 127.)  He sold the liquor store because he "felt it was time to move on to something else."  (Tr. 40.)  After he sold the liquor store, his son's assisted-living business hired him as a consultant.  (Tr. 40–41.)  He worked as a consultant until June 2, 2004.  (Tr. 38–41, 126.)  He has not worked since 2004.  (Tr. 126.)  He was last insured for disability benefits on December 31, 2004.  (Tr. 2.)

Plaintiff completed a Disability Report for the Social Security Administration ("SSA"), which was transcribed on October 3, 2008.  (Tr. 122–33.)  In the report, Plaintiff did not mention his work as a consultant.  He did, however, describe his

3

work as a liquor-store owner from 1981 through 2000. (Tr. 127–28.) The job required lifting, sales, cleaning, taking inventory, stocking, supervising, moving kegs and carry-outs, and rearranging displays. (Tr. 127.) He frequently lifted merchandise ranging in weight from 50 to 100 pounds. (Tr. 127.)

Plaintiff also submitted a Function Report for the SSA, which was completed by Gloria Smith on October 15, 2008. (Tr. 142–49.) In that report, he indicated that he spent his days sitting and lounging because it was hard to walk and move around. (Tr. 142.) He could dress himself, but doing so took extra time. (Tr. 143.) He was learning to use an electric shaver and an electric toothbrush with his left hand because he could no longer shave or brush his teeth with his right hand. (Tr. 143.) He was able to drive, but he required a cane, walker, or wheelchair when walking. (Tr. 145, 148.) He needed to rest for a few minutes after walking approximately 30 feet. (Tr. 147.)

Plaintiff's wife completed a Third-Party Function Report for the SSA on October 13, 2008. (Tr. 134–41.) She explained that Plaintiff can no longer go on walks, cut grass, cook, perform household chores, shower, get dressed, use the toilet without assistance, or shave. (Tr. 135.) She stated that, while Plaintiff can still drive a car, he does not go out much without her because he gets too tired. (Tr. 137–38.) She indicated that Plaintiff always uses some combination of a walker, cane, and brace. (Tr. 140.) She further stated that these aids were prescribed by a doctor in October 2007. (Tr. 140.)

## A.    The Medical Records

This social security appeal depends largely on the contents of medical records Plaintiff's representatives submitted to the SSA after the ALJ held the hearing, and additional medical records submitted after the ALJ reached his decision.  Plaintiff submitted the medical records in Exhibits 1F through 12F to the ALJ prior to the hearing.  (Tr. 36.)  Plaintiff submitted the medical records in Exhibit 13F to the ALJ after the hearing, but before the ALJ released his decision.  (*See* Tr. 31.)  And Plaintiff submitted the medical records in Exhibits 14F through 20F to the Appeals Council after the ALJ released his decision.  (Tr. 5–6.)

### 1.    Exhibits 1F Through 12F – Submitted Prior to the ALJ's Decision

The medical records submitted to the ALJ are found in Exhibits 1F through 13F.  (Tr. 193–391.)  Exhibits 1F through 12F, which Plaintiff submitted before the ALJ made his decision, all pertain to medical visits after December 31, 2004, the date last insured.  (Tr. 193–381.)  For example, on April 6, 2005, Dr. Suslavich of St. Luke's Medical performed a C.T. scan of Plaintiff's brain and found the brain stem and cerebellum to appear normal.  (Tr. 205.)  Then, on December 8, 2005, Plaintiff underwent a treadmill-exercise stress test monitored by Dr. Tekler at St. Luke's.  (Tr. 202.)  The stress test produced results within the normal range.  (Tr. 203.)

On April, 28, 2006, Dr. Carmichael of St. Luke's performed an MRI of Plaintiff's brain.  (Tr. 195.)  The MRI did not reveal any lesions.  (Tr. 195.)  The

MRI recorded a small, nonspecific, white matter in the right external capsule, but the exam was otherwise unremarkable. (Tr. 195.)

On June 20, 2006, Dr. Goellner diagnosed Plaintiff with cervical myelopathy due to cervical cord compression at the C3-4 level and the C6-7 level. (Tr. 324.) On July 31, 2006, an anterior cervical discectomy and fusion was performed. (Tr. 319.) During a follow-up visit on September 14, 2006, Plaintiff told Dr. Goellner that he felt quite good. (Tr. 319.) Specifically, he told Dr. Goellner that he "fe[lt] as if he has had increased strength and power in his legs." (Tr. 319.) Dr. Goellner noted that Plaintiff's gait was steady and that his walking was clearly improved from its preoperative state. (Tr. 319.)

On January 25, 2007, Plaintiff visited Dr. Morton complaining that his legs were weak and he had a hard time walking. (Tr. 316.) Plaintiff stated that he did not use a cane or a walker and wanted to avoid using any kind of assistive device if at all possible. (Tr. 316.) On July 24, 2007, Plaintiff told Dr. Morton that he was still unwilling to use a cane, walker, or bracing aids even though he continued to fall at times. (Tr. 308.) On November 30, 2007, Plaintiff told Dr. Morton that he had been using his cane since he underwent the placement of the Baclofen pump on November 2, 2007. (Tr. 297.) But by January 25, 2008, Plaintiff reported to Dr. Morton that he was using his cane at all times throughout the day and that he was not falling as regularly as he had in the past. (Tr. 291.)

On September 15, 2008, Dr. Crisostomo noted in a letter to Dr. Goellner that Plaintiff tended to drag his right foot when walking. (Tr. 342.) In a follow-up

6

visit on October 7, 2008, Dr. Crisostomo diagnosed Plaintiff's condition as cervical myelopathy. (Tr. 339.)

### 2. Exhibit 13F – Submitted Prior to the ALJ's Decision

Plaintiff submitted the medical records in Exhibit 13F after the hearing but before the ALJ reached his decision. Exhibit 13F pertains to medical visits dated between March 15, 2000, and June 3, 2004. (Tr. 382–91.) On March 15, 2000, Dr. Tekler noted Plaintiff's history of coronary artery disease, but he stated that Plaintiff's cardiac health was doing well. (Tr. 391.) On December 19, 2001, Dr. Tekler noted that Plaintiff continued to have good cardiac health, but recommended that Plaintiff aggressively treat his lipids and other coronary risk factors. (Tr. 390.) On August 20, 2002, Dr. Tekler reported that Plaintiff was doing very well since increasing his medication and noted that he was free of any anginal symptoms or problems. (Tr. 389.) On August 28, 2003, Dr. Tekler again noted that Plaintiff's cardiac health was doing well, that Plaintiff was having no anginal symptoms or problems, and that Plaintiff could be slowly weaned off a prescription for isosorbide dinitrate. (Tr. 387.)

On March 29, 2004, Plaintiff saw Nurse Marsh because Plaintiff's wife was concerned about his cardiac history and diabetes after Plaintiff discontinued taking the drug Zocor due to its side effects. (Tr. 386.) While meeting with Nurse Marsh, Plaintiff denied experiencing any chest pain or shortness of breath. (Tr. 386.) He told Nurse Marsh that he was walking forty-five minutes daily.

(Tr. 386.)  Nurse Marsh and Plaintiff discussed alternative statins that might have fewer side effects than Zocor.  (Tr. 386.)

On June 3, 2004, Plaintiff visited Dr. Goellner.  (Tr. 383–85.)  Plaintiff told Dr. Goellner that he was having trouble standing from a squat and that he was walking less.  (Tr. 383.)  He had been walking up to five miles per day, five times per week.  (Tr. 383.)  In the previous eight months, he said that he had only been walking about two miles, three times per week.  (Tr. 383.)  He could walk quickly without chest pain or shortness of breath, but reported some unsteadiness of gait.  (Tr. 383.)  During the physical examination, Dr. Goellner observed that Plaintiff had a normal gait, including heel-and-toe walking.  (Tr. 384.)  In addition, Dr. Goellner observed that, contrary to Plaintiff's report of having trouble standing from a squat, Plaintiff could do so easily.  (Tr. 384.)  Dr. Goellner listed Plaintiff's medical conditions as including coronary artery disease, type 2 diabetes, hypertension, hyperlipidemis, and mild elevation of indirect bilirubin.  (Tr. 384.)  Dr. Goellner's plan included sending Plaintiff back to the diabetes center for a refresher course on diabetes management and he encouraged Plaintiff to get back to a rigorous walking program.  (Tr. 385.)

### 3.     Exhibits 14F Through 20F – After the ALJ's Decision

After the ALJ released his decision, Plaintiff submitted additional medical records in Exhibits 14F through 20F.  (Tr. 5–6; *see also* Tr. 392–567.)  Several of these medical records were duplicates of records submitted in Exhibit 13F prior to the ALJ's decision.  (*Compare* Tr. 401–06, 489–94, 507–09, 532–36, 539 *with*

8

Tr. 383–91.)  Other records pertain to Plaintiff's coronary artery disease and his

pre- and post-surgery care.  (Tr. 392–95, 397–400, 407–15, 417–20, 424–76,

482–83, 486–88, 495–504, 540–48, 552–66.)

The remaining medical records pertain to a variety of illnesses and doctor

visits.  Two medical records pertain to a nosebleed.  (Tr. 421–22.)  Another

pertains to a cut on Plaintiff's right, index finger.  (Tr. 423.)  One medical record

pertains to an ultrasound of Plaintiff's abdomen due to an elevation in bilirubin;

however, all of Plaintiff's organs appeared normal.  (Tr. 477–78.)  A medical

record of June 13, 2004, is a description of Plaintiff's medical history; however, it

does not include a diagnosis or assessment of his physical mobility.  (Tr. 510.)

Several medical records dated October 19, 2000 through March 18, 2004 pertain

to Plaintiff's visits with Dr. Long for complete physical exams, to recheck his

diabetes, to review his coronary artery disease medications, and to examine his

right knee due to pain after tiling his kitchen.  (Tr. 513–22.)  Medical records from

November 6, 1991 through December 2, 1999 pertain to Plaintiff's visits with Dr.

Rutka to recheck his diabetes, to receive stitches, for a nosebleed, to follow-up

on his bypass surgery, and to discuss his medications.  (Tr. 523–31.)  Two

medical records are notes from other hospitals and clinics to Dr. Long notifying

him that Plaintiff failed to keep a diabetes counseling appointment on March 1,

2001 and was scheduled for an Angiogram on November 26, 2001.  (Tr. 537–

38.)  There is a diabetic eye evaluation on April 9, 1997, and a diabetic education

summary.  (Tr. 549–50.)  And another medical record pertains to an ultrasound of Plaintiff's abdomen, which was submitted twice.  (*Compare* Tr. 551 *with* Tr. 477.)

## III.  Testimony

Plaintiff testified at the hearing before the ALJ on June 14, 2010. (Tr. 34–53.)  He is married and lives with his wife in a house they own.  (Tr. 37.) He was 59-years-old at the time of the hearing, and had a high school education. (Tr. 37.)  He has a current Minnesota driver's license with no restrictions. (Tr. 37.)

Plaintiff's testimony about his impairments resembled the assertions in his application for benefits to the SSA discussed above.  For example, he testified about owning and operating the liquor store until 2000 and that he sold it because he felt it was time to move on to something else.  (Tr. 38, 40.)  He testified that, at the time of the hearing, he continued managing his rental properties, which consisted of a duplex and a commercial property.  (Tr. 41.)  He also testified about acting as a consultant for his son's assisted-living facility. (Tr. 40–41.)

Plaintiff further testified that in 2003, he and his family went on vacation to Florida.  (Tr. 47.)  He was not walking well enough at that time to get out of the cart at Disneyland.  (Tr. 47.)  His memory of that trip helped him recall that 2003 was a time he had having difficulty walking.  (Tr. 47.)

He testified that in June 2004, he was having difficulties with his right side. (Tr. 42.)  Although he stated that his right side was not paralyzed, Plaintiff found

it hard to walk, write, etc. (Tr. 42.) At that time, Plaintiff was seeing Dr. Goellner at St. Luke's Medical. (Tr. 42.) Dr. Goellner did not diagnose him with multiple sclerosis. (Tr. 42.) Instead, Dr. Goellner's treatment focused on Plaintiff's back and spine. (Tr. 42.) He had two spinal surgeries. (Tr. 43.)

Plaintiff also testified that sometime in 2009, he changed neurologists and went to Abbott Northwestern in the Cities. (Tr. 43.) The doctor diagnosed him with multiple sclerosis when she saw lesions on the MRI. (Tr. 43.)

Plaintiff's wife also testified as a witness at the hearing. (Tr. 44–51.) She stated that in 2004 Plaintiff's ability to walk, sit, and stand were all deteriorating. (Tr. 45.) She was concerned about the fact that it was affecting his right side because she thought he may have had a stroke. (Tr. 45.) She said the doctors were testing for everything, but it was not until they saw Dr. Evans from Abbott that the lesions were noticed. (Tr. 45.) Dr. Evans said she did not know why the other doctors did not pick up on this before. (Tr. 45.)

Mrs. Priley testified that Plaintiff has not done any work at all since 2004. (Tr. 45.) In addition, she contributed to Plaintiff's testimony that he was not able to participate in all of the activities on their 2003 vacation. (Tr. 47–48.) She stated that Plaintiff had to sit in the car at Epcot and could not go to the beach because he could not walk in the sand. (Tr. 48.)

A vocational expert also testified at the hearing. (Tr. 45–52.) She stated that while Plaintiff had not been employed in a sedentary position, he did have skills transferrable to sedentary work. (Tr. 51–52.) She opined that Plaintiff

acquired record-keeping skills and gained experience purchasing and book-keeping as the owner of his liquor store.  (Tr. 52.)

Plaintiff's representative at the hearing told the ALJ that he had requested medical records from 2004, but had not received them.  (Tr. 36.)  The ALJ expressed his concern that the records were not before him and gave Plaintiff's representative another opportunity to produce the records.  (Tr. 48.)  Noting that Plaintiff's case likely depended on the medical records relevant to the December 31, 2004 date last insured, the ALJ gave Plaintiff's representative thirty days to produce all the records.  (Tr. 51.)

## IV.    The ALJ's Findings and Decision

On January 6, 2011, in a written decision the ALJ concluded that Plaintiff was not disabled as defined in the SSA, at any time from the original alleged onset date of June 2, 2004, through the date last insured, December 31, 2004. (Tr. 21.)  The ALJ followed the five-step procedure for determining if an individual is disabled.  *See* 20 C.F.R. § 404.1520(a).

At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of June 2, 2004, through his date last insured of December 31, 2004.  (Tr. 23.)  At the second step, the ALJ determined that Plaintiff had severe impairments of multiple sclerosis, coronary artery disease, and hypertension.  (Tr. 23.)  The ALJ also determined that Plaintiff had diabetes; however, he found it to be a non-severe impairment.  (Tr. 23.)  At step three, relying on Plaintiff's medical records, the

12

ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 23–24.)

At step four, the ALJ determined that, through Plaintiff's date last insured, he had the residual functional capacity ("RFC") to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a). (Tr. 24.) In making this finding, the ALJ first determined that Plaintiff's medical records supported the conclusion that Plaintiff had medically determinable physical impairments, which included impairments that could reasonably be expected to produce Plaintiff's pain or other symptoms. (Tr. 24.) Next, however, the ALJ determined that the intensity, persistence, and limiting effects of Plaintiff's alleged symptoms were not substantiated by objective medical evidence, and he concluded that Plaintiff's statements concerning the symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. (Tr. 24.) Although the ALJ found Petitioner's testimony about his right-side problems, difficulties walking and writing, and his multiple sclerosis diagnosis generally credible, he found Plaintiff's testimony about his symptoms less credible during the time period on or before December 31, 2004. (Tr. 25.) The ALJ reasoned that his medical records indicate, at that time, that Plaintiff had a generally normal gait, could walk two miles, and could stand easily from a squat position. The records did not reflect any difficulties with Plaintiff's right upper extremity. (Tr. 25.) The ALJ concluded that Plaintiff's condition had progressively worsened over the years since 2004,

13

but his impairments did not prevent him from performing a full range of sedentary work prior to his date last insured on December 31, 2004. (Tr. 25.) The ALJ also addressed the testimony of Plaintiff's wife. (Tr. 25.) The ALJ found her testimony about Plaintiff's worsening condition over time to be partially credible, but he was not convinced that Plaintiff had deteriorated to the extent that would prevent him from performing sedentary work prior to his date last insured. (Tr. 25.)[3]

At step four, the ALJ also determined that Plaintiff was unable to perform any past relevant work. (Tr. 27.) Plaintiff's past relevant work as a liquor store owner was classified by the vocational expert at the light-exertional level. (Tr. 27.) Therefore, Plaintiff's past relevant work was beyond the ALJ's RFC finding, which limited Plaintiff to sedentary work. (Tr. 27.)

At step five of the disability determination, the ALJ determined that Petitioner had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy as defined in 20 C.F.R. § 404.1568(d), 404.1569, and 404.1569a. (Tr. 27.) The ALJ based this conclusion on the vocational expert's report that

---

[3] The ALJ found that at the time of the hearing, Plaintiff was disabled based on his multiple sclerosis. (Tr. 25.) He met Listing 11.09 for multiple sclerosis because he had significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gait and station. (Tr. 25.) The medical evidence suggested that Plaintiff met Listing 11.09 around the end of 2007 or beginning of 2008. (Tr. 25.) However, the ALJ determined that the records did not indicate that Plaintiff was disabled prior to that date. (Tr. 25.)

Plaintiff would have been able to perform the requirements of representative occupations such as a billing clerk, telephone solicitor, and accounting clerk. (Tr. 28, 183.)  In the state of Minnesota, the vocational expert found 8,900 billing clerk jobs, 4,600 telephone solicitor jobs, and 35,000 accounting clerk jobs. (Tr. 28, 183.)  The ALJ further concluded that Plaintiff's book-keeping and record-keeping skills were transferable to the billing clerk position and accounting clerk position.  (Tr. 28, 183.)  And he concluded that Plaintiff's selling and customer-services skills were transferable to the telephone-solicitor position.  (Tr. 28, 183.)

Finally, after evaluating Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Petitioner was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.  (Tr. 28.)  Therefore, the ALJ found Plaintiff "not disabled."  (Tr. 28.)

## DISCUSSION

### I.    Standard of Review

Congress has prescribed the standards by which disability benefits may be awarded under the SSA.  "Disability" under the SSA means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the SSA. *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second, that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Reed v. Sullivan*, 988 F.2d 812, 814 (8th Cir. 1993) (internal quotation marks omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckely v. Apfel*, 152

F.3d 1056, 1059 (8th Cir. 1998)). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the ALJ's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

## II. Whether Plaintiff was Unfairly Treated or Prejudiced Because of an Incomplete Record

Plaintiff challenges the ALJ's RFC finding on the grounds that the ALJ did not consider all relevant medical records. A claimant's RFC is what he or she

can do despite his or her limitations.  20 C.F.R. § 404.1545(a).  In determining a claimant's RFC, the ALJ must consider all relevant evidence and evaluate the claimant's credibility.  *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

Plaintiff asserts that "an ALJ has an inherent obligation to develop a full and fair hearing, including development of the record."  (Pl.'s Br. 10.)  Plaintiff concedes that the ALJ will normally rely upon counsel to develop the record.  (Pl's Br. 10.)  However, Plaintiff claims that his representative at the time of the hearing was so ineffective that Plaintiff was not represented at all.  (*See* Pl.'s Br. 11.)  And Plaintiff asserts that the ALJ failed to adhere to his "dut[y] to develop the facts fully and fairly," resulting in unfairness and prejudice to Plaintiff's claim for benefits.  (*See* Pl's Br. 11 (citing *Highfill v. Bowen*, 832 F.2d 112, 115 (8th Cir. 1987).)  Thus, the gist of Plaintiff's argument is that the ALJ's decision was not supported by substantial evidence on the record as a whole because the ALJ failed to fulfill his obligation to fully and fairly develop the record.  Plaintiff asks the Court to reverse the ALJ's decision or remand the case to the Commissioner for further proceedings.  (Pl's Br. 13.)

A remand is appropriate when an incomplete record causes a claimant to be treated unfairly or prejudiced:

> [T]he ALJ has a duty to develop the facts fully and fairly, particularly when the claimant is not represented by counsel.  Although mere lack of counsel does not in itself deprive a claimant of a fair hearing, it does enhance the ALJ's duty to bring out the relevant facts.  Unfairness or prejudice resulting from an incomplete record— whether because of lack of counsel or lack of diligence on the ALJ's part—requires a remand.

*Highfill v. Bowen*, 832 F.2d 112, 115 (8th Cir. 1987) (citations and quotations omitted).

Plaintiff claims that the record was incomplete until his counsel, whom he retained after the hearing, submitted an additional 176 pages of medical records after the ALJ issued his decision. (Pl.'s Br. 3.) At the time of the hearing, the record included an Application for Disability Insurance Benefits, several Disability Reports, a Function Report, a Third Party Function Report, a Vocational Consultant Case Analysis, a Vocational Interrogatory, Medical Records, an Initial and a Reconsideration Medical Evaluation/Case Analysis, an Initial and a Reconsideration Psychiatric Review/Medical Evaluation/Case Analysis, and other supporting documents. (*See* Tr. 29–31; *see also* 54–391.) The Medical Records consisted of Exhibits 1F through 5F and 12F. (Tr. 30–31.) They were dated from April 6, 2005, through October 7, 2008, which is after Plaintiff's date last insured. (Tr. 30–31.) Once the ALJ received those exhibits into evidence at the hearing, the Plaintiff's representative asked the ALJ for an opportunity to obtain medical records from 2004 and earlier. (Tr. 36.) As noted above, the ALJ gave Plaintiff's representative an additional thirty days to obtain the medical records. (Tr. 52.) Thus, the ALJ provided Plaintiff's representative an opportunity to submit additional materials to support Plaintiff's claim for benefits. But, as also noted above, Plaintiff did not submit any additional medical records until after the ALJ issued the decision, not within the thirty-day grace period. This Court sees no

error or unfairness from the ALJ offering Plaintiff this opportunity to supplement the record.

In addition to the documents listed above, the record before the ALJ included the testimony given at the hearing. Plaintiff contends the record is also incomplete because his representative did not ask the witnesses any questions at the hearing, make any arguments at the hearing, or offer a written argument in favor of Plaintiff at the hearing. (Pl.'s Br. 11.) However, a claimant's representative is not required to ask any questions at the hearing before the ALJ: "mere lack of counsel does not in itself deprive a claimant of a fair hearing, [but] it does enhance the ALJ's duty to bring out the relevant facts." *Highfill v. Bowen*, 832 F.2d 112, 115 (8th Cir. 1987). In an attempt to bring out the relevant facts, the ALJ asked several questions of each witness regarding the severity of Plaintiff's disability in 2004. He elicited testimony from Plaintiff concerning his right-side difficulties, his troubles walking and writing, and his struggles on his family vacation to Florida in 2003. He elicited testimony from Plaintiff's wife about Plaintiff's ability to engage in daily activities. The ALJ also questioned the vocational expert about the severity of Plaintiff's disability as it pertained to his employability in 2004. Given the ALJ's attempts to elicit testimony concerning Plaintiff's condition, this Court cannot conclude that the hearing was unfair simply because Plaintiff's own hearing representative asked no questions of his own.

Plaintiff next contends that the record was incomplete because he produced an additional 176 pages of medical records after the ALJ issued his

decision. (Pl.'s Br. 3.) The additional medical records comprise Exhibits 14F

through 20F, and relate to Plaintiff's coronary artery disease, his pre- and post-

bypass surgery care, and other matters. Several of these records were

duplicates of others submitted earlier in the case. (*Compare* Tr. 486–88, 495–

504, 552 *with* Tr. 397–400, 407–15; *compare* Tr. 401–06, 489–94, 507–09, 532–

36, 539 *with* Tr. 383–91.) Other records submitted after the decision pertain to

nosebleeds, cut fingers, diabetic eye evaluations, diabetic education, physical

exams, diabetes rechecks, medication discussions, and an examination of his

right knee due to pain after tiling his kitchen, which are not relevant to Plaintiff's

alleged impairments. (Tr. 421–23, 513–31, 549–50.) Thus, because these

additional records merely duplicated records submitted before, or related to

issues that could not have impacted the ALJ's consideration of Plaintiff's

impairments and RFC, Plaintiff cannot show unfairness or prejudice because

they were not submitted earlier in the case. "Remand is appropriate only upon a

showing by the claimant 'that there is new evidence which is material and that

there is good cause for the failure to incorporate such evidence into the record in

a prior proceeding.'" *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997)

(quoting 42 U.S.C. § 405(g)). To be considered material, the new evidence must

be "non-cumulative, relevant, and probative of the claimant's condition for the

time period for which benefits were denied." *Woolf v. Shalala*, 3 F.3d 1210, 1215

(8th Cir. 1993). "Furthermore, it must be reasonably likely that the

Commissioner's consideration of this new evidence would have resulted in an

award of benefits." *Jones*, 122F.3d at 1154 (citing *Woolf*, 3 F.3d at 1215). The additional records submitted after the ALJ's decision satisfy none of these requirements.

Finally, Plaintiff asserts that the medical records comprising Exhibit 13F, which he submitted after the hearing, but before the ALJ's decision, support his claim for benefits. Two of the medical records in Exhibit 13F demonstrate that Plaintiff's coronary artery disease did not adversely affect his ability to perform sedentary work in 2004. During Plaintiff's visit with Nurse Marsh on March 29, 2004 to discuss his lipids, Nurse Marsh observed that Plaintiff denied experiencing any chest pain or shortness of breath and told her that he walked 45 minutes daily. And after Dr. Goellner became Plaintiff's primary care giver on June 3, 2004, Dr. Goellner concluded that Plaintiff's had regular heart tones and no heart murmur or "gallop." (Tr. 384.) In addition, Dr. Goellner's observations about Plaintiff's gait normality, the distances he could walk, and his ability to stand easily from a squatting position, indicate that the ALJ's conclusion that Plaintiff was capable of performing sedentary work in 2004 was, indeed, supported by substantial evidence on the record as a whole.

For all of the foregoing reasons, this Court concludes that the ALJ fully and fairly developed the record and properly relied on vocational expert testimony in concluding that Plaintiff had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy.

Aside from his arguments about the ALJ's alleged failure to fully develop the record and other arguments about the record being incomplete, Plaintiff presents no argument that the ALJ's decision was unsupported by substantial evidence. Having reviewed the record, this Court concludes that substantial evidence on the record as a whole supports the ALJ's conclusion that Plaintiff's combination of impairments before his last-insured date of December 31, 2004, were not so limiting that he was unable to perform work consistent with the ALJ's RFC finding. Several medical records from the period leading up to Plaintiff's last-insured date indicate that Plaintiff's conditions before the end of 2004 would allow him to perform a full range of sedentary work. Therefore, this Court concludes that substantial evidence on the record as a whole supports the ALJ's decision.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 6), be **DENIED**;

2.      Defendant's Motion for Summary Judgment (Doc. No. 14), be **GRANTED**; and

3.      If this Report and Recommendation is adopted, that judgment be entered.

Date: May 22, 2013

__s/ Jeffrey J. Keyes_____ _
JEFFREY J. KEYES
United States Magistrate Judge


Under Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 5, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the bases of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **fourteen days** after service thereof. All briefs filed under this rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.